CHARLES M. TEBBUTT, WSBA #47255
DANIEL C. SNYDER, *pro hac vice*
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel. 541.344.3505

BRAD J. MOORE, WSBA #21802
Stritmatter Kessler Whelan
200 Second Avenue West
Seattle, WA 98119
Tel. 206.448.1777

*Additional Counsel on signature page*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, INC., a Washington Non-Profit Corporation *and* CENTER FOR FOOD SAFETY, INC., a Washington D.C. Non-Profit Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> HENRY BOSMA DAIRY, a Washington Proprietorship, aka HANK BOSMA DAIRY, aka BOSMA DAIRY, LIBERTY DAIRY, LLC, a Washington Limited Liability Company, ARIZONA ACRES LIMITED PARTNERSHIP, a Washington Limited Partnership, LIBERTY ACRES, LLC, a Washington Limited Liability Company, and MR. HENRY BOSMA, an individual, <br><br> Defendants. | Case No.: CV-13-3019-TOR <br><br> [PROPOSED] CONSENT DECREE |

[PROPOSED] CONSENT DECREE- 1

WHEREAS the Plaintiffs, the Community Association for Restoration of the Environment, Inc., and Center For Food Safety, Inc., initiated the above-captioned action by filing a Complaint on February 14, 2013, alleging that the Defendants named in this lawsuit[1] ("Defendants" or "Bosma Defendants") had violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, seeking injunctive and declaratory relief and attorneys and expert witness fees and costs;

WHEREAS the Court entered an Order on January 14, 2015 (ECF No. 320 in case number 13-CV-3016-TOR), finding certain similarly situated defendants in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, by causing or contributing to an imminent and substantial endangerment to human health and the environment and by disposing of solid waste in such a manner as to constitute open dumping;

WHEREAS the Parties agree that the Court would likely come to the same or similar conclusions as to the Bosma Defendants;

WHEREAS the Plaintiffs have agreed to forego their request for a complete RCRA Corrective Action Study and instead work with Defendants to take immediate measures to address what Plaintiffs contend are the most significant and likely sources

---

[1] The original complaint was amended on October 6, 2014, to include additional defendants Arizona Acres Limited Partnership, Liberty Acres, LLC, and Mr. Henry Bosma.

[PROPOSED] CONSENT DECREE- 2

of contamination and to ensure that the local community is provided access to safe and clean drinking water;

WHEREAS the Parties mutually agree and request that the terms of this Consent Decree be presented to the Unites States Environmental Protection Agency (EPA) for incorporation into the March 2013 Administrative Order on Consent (AOC) between the EPA and Defendants.  It is the intent of the Parties that the terms of this Consent Decree will be incorporated into a new AOC and that EPA be appointed to oversee implementation of remedial actions set forth in this Consent Decree, and incorporated into the new AOC, as further explained herein;

WHEREAS after consultation with their respective counsel, Plaintiffs and Bosma Defendants (collectively referred to as the "Parties" and singularly as a "Party") hereby wish to settle this lawsuit to avoid the risks of further litigation and appeal and to resolve the controversy between them;

NOW, THEREFORE, upon the consent of the Parties, and upon consideration of the mutual promises contained herein, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

## **GENERAL PROVISIONS**

1.    This Court has jurisdiction over the Parties and the subject matter of this lawsuit pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331.  Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. § 1391(b).  This Court shall have

continuing jurisdiction over this lawsuit for the purposes of interpretation, enforcement, and, if necessary, modification of this Consent Decree.

2.    The undersigned representative for each Party certifies that he/she is fully authorized by the Party whom he/she represents to enter into the terms and conditions of this Consent Decree and to legally bind the Party to it.

3.    This Consent Decree shall apply to and be binding upon the Parties to this lawsuit and upon all successors and assigns of the Parties.  This provision is intended to require full compliance with this Consent Decree so long as any portion of the Dairy Facility is used by any person or entity in the course of conducting dairy operations, including the application of manure.  However, nothing herein shall prevent Bosma Defendants from discontinuing their dairy operations, or from transferring any of the Dairy Facility to other owners for uses other than for dairy operations; this Consent Decree shall no longer apply to real property that is not being used for dairy operations or other agriculturally related operations that involve the application of nitrogen fertilizers. Defendants, or any of their successors or assigns, may sell the Dairy Facility, or any of the real property upon which the Dairy Facility or its operations may currently be conducted, without Plaintiffs' consent and without approval of the Court; provided, however, that Defendants provide a copy of the Consent Decree to the new owner and provide written notice to Plaintiffs of the sale within 30 days of closing. The term "Dairy" or "Dairy Facility" shall refer to the facilities commonly known as Henry

[~~PROPOSED~~] CONSENT DECREE- 4

Bosma Dairy and Liberty Dairy, LLC, as described in Appendix A of the AOC, as well as the properties owned by the Defendants named herein used for manure application.

4.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Consent Decree and the subject matter of this lawsuit.  The Parties hereby acknowledge that there are no representations or understandings relating to the lawsuit or its settlement other than those expressly contained within this Consent Decree.  This Consent Decree expressly supersedes, extinguishes and replaces all prior stipulations and agreements between the Parties, except for the temporary agreement set forth in Paragraph 46.

5.    This Consent Decree, and the AOC that incorporates its terms, may not be modified in any material respect except by explicit written amendment agreed to by the Parties.  Non-material modifications may be made by the Parties upon written consent.

6.    This Consent Decree constitutes the full and complete settlement of all claims, rights, demands, and causes of any action of any kind for Defendants' alleged violations, through the date of entry of the Consent Decree, that Plaintiffs asserted or could have asserted against the Defendants in this lawsuit.  Plaintiffs hereby release all such claims and covenant not to sue Defendants in connection with them.  This covenant not to sue in no way releases Defendants from compliance with this Consent Decree or other applicable law.  Furthermore, this covenant not to sue shall in no way limit Plaintiffs' ability to enforce the terms of this Consent Decree, as incorporated into

the new AOC, or any future and previously unalleged violations of law committed by Defendants.

7.    Each Party acknowledges and represents that it has relied on the legal advice of its attorneys, all listed at the end of the Consent Decree, who are the attorneys of its own choice, and that the terms of this Consent Decree have been completely explained to the Party by its attorney(s), and that the terms are fully understood and voluntarily accepted.

8.    In the event that any part of this Consent Decree is deemed by a court of competent jurisdiction to be unlawful, void, or for any reason unenforceable, and if that part is severable from the remainder of the Consent Decree without frustrating its essential purpose, then the remaining parts of the Consent Decree shall remain valid, binding, and enforceable.

9.    If for any reason the Court should decline to approve this Consent Decree in the form presented, then the Parties agree to continue negotiations in good faith in an attempt to cure the objection(s) raised by the Court to entry of this Consent Decree.

10.    This Consent Decree may be signed in counterparts, and such counterpart signature page shall be given full force and effect.

11.    The Dairy Facility includes two interrelated dairies presently located at 4300 Beam Rd., Zillah, Washington, as further described in paragraphs 10(b) and 10(c) and Appendix A of the AOC.  The Dairies meet the federal and state law definitions of a large concentrated animal feeding operation or "CAFO."

12.      In operating the Dairy Facility, Defendants shall abide by this Consent Decree, the Resource Conservation and Recovery Act, the Federal Water Pollution Control Act ("Clean Water Act"), the Washington Dairy Nutrient Management Act, RCW 90.64 *et seq.*, and the Dairy Facility's Nutrient Management Plans (NMP).  If any of the terms of this Consent Decree are stricter than the aforementioned laws, then the terms of the Consent Decree shall control.  If any of these laws are stricter than the terms of the Consent Decree, either now or in the future, such stricter laws shall apply.  Notwithstanding the foregoing, the Parties agree that nothing in this Consent Decree may be construed to obligate Defendants to violate any law, regulation, or the current terms of the AOC.  In the event of any perceived conflict, the Parties agree to submit the matter to the dispute resolution process described in Paragraph 55.

13.      Defendants shall update their NMP to reflect the requirements set forth herein within 45 days of entry of the Consent Decree and provide a copy to Plaintiffs for review and comment.

## OVERSIGHT OF CONSENT DECREE IMPLEMENTATION

14.      At the request of the Parties and the Court, and to the extent agreed to by EPA, EPA shall oversee implementation and enforcement of the terms of the Consent Decree. Further, any and all reports and information required to be produced to the EPA under the AOC shall hereafter be simultaneously provided to Plaintiffs' designee(s).

## SITE INSPECTIONS AND RECORD KEEPING

15.    For the duration of this Consent Decree, the EPA shall be allowed to inspect the Dairy Facility, including any application fields owned, leased, or otherwise controlled by the Defendants, upon reasonable notice and at reasonably convenient times. Plaintiffs may designate up to four individuals to accompany EPA on any such inspection; provided, however, that any such designated individuals shall possess reasonable scientific or professional credentials so as to provide a meaningful assessment of Defendants' progress under this Consent Decree.

16.    Inspections shall be conducted between the hours of 8:00 AM and 6:00 PM on weekdays, unless otherwise agreed to by the Parties.  Plaintiffs' representatives shall be accompanied at all times by a representative of Defendants' choosing.

17.    For the duration of this Consent Decree, Defendants agree to make available to Plaintiffs, at no cost to Plaintiffs, electronic copies of any reports, correspondence, sampling results, or other documents related to the Dairy Facility's Dairy Nutrient Management Plans, the AOC, and any documents generated as part of this Consent Decree.  Defendants may withhold from Plaintiffs documents that are legitimately protected by attorney-client privilege or the attorney work product doctrine.  If Defendants assert that a document is immune from production to Plaintiffs, then Defendants shall provide to Plaintiffs a privilege log containing a description of the nature of the document(s) withheld, its author and recipients, its date, the privilege or

[PROPOSED] CONSENT DECREE- 8

immunity asserted, and a description of the content of the document which, without revealing privileged or protected information, enables Plaintiffs to evaluate whether the privilege or immunity is being properly asserted.

## LAGOON LINING AND MAINTENANCE

18.     Defendants hereby agree to double line all lagoons with GCL liners and a 40 mil synthetic liner as set forth in the April 20, 2015 Dairy Lagoon Work Plan, attached hereto as Exhibit 1, or as may reasonably be modified through the discussions of Plaintiffs, Defendants, and the EPA.  The lining shall occur at a rate of at least two per year, shall be completed on or before December 31, 2019, and shall be accomplished at least as quickly as is set forth in the schedule set forth in the Lagoon Work Plan and any modification required by EPA. The current schedule for lagoon lining is as follows.

    a.   Lagoon #6, by no later than December 31, 2015;

    b.  Lagoon #18 by no later than December 31, 2015;

    c.  Lagoon #14, by no later than December 31, 2015, provided installation and performance of centrifuge so allow;

    d.  Lagoon #3, by no later than December 31, 2016;

    e.  Lagoon #1, by no later than December 31, 2016;

    f.  Lagoon #2, by no later than December 31, 2016;

    g.  Combined Lagoons #15, #16 and #17, by no later than December 31, 2016;

h.  Red Water Pond, by no later than December 31, 2017;

i.  Lagoons #4A and #4B, by no later than December 31, 2017;

j.  Lagoons #5, #7, #8, and #9, by no later than December 31, 2018;

k.  Lagoons #10, #11, #12 and #13, by no later than December 31, 2019;

l.  Lagoons #18, #19 and #20 by no later than December 31, 2020[2].

The Parties acknowledge that the above time-commitments are subject to the availability of materials, unanticipated weather or site conditions, and EPA's ability to review and approve the lagoon installation plans in a timely manner.  Should the EPA fail to timely review and approve the lagoon installation plans, and/or should unanticipated weather or site conditions or the unavailability of materials cause delay, the Parties agree to reconvene their discussions and agree to new date(s) or to otherwise submit this matter to the dispute resolution process set forth in Paragraph 55. Notwithstanding the foregoing, Defendants hereby covenant to use their best efforts and to hire such consultants and contractors as may be reasonably necessary to accomplish the installations on the dates set forth above.  Further, the Parties acknowledge that Defendants may elect to significantly reduce the number of lagoons and change the

---

[2] While the EPA Lagoon Plan allows for these lagoons to be lined as late as December 31, 2020, for purposes of this Consent Decree Defendants agree that they shall be lined by December 31, 2019.

configuration of the remaining lagoons so as to more efficiently store nutrients.  This Consent Decree shall be deemed to be automatically modified by any revised lagoon plan that is approved by the EPA, provided that Plaintiffs have the reasonable opportunity, consistent with other provisions herein, to review and comment to EPA and Defendants, and that requires lining of all Dairy Facility lagoons by December 31, 2019.

19.    Defendants shall provide to Plaintiffs a copy of the Pre-Final (90%) Design addressed in Section 6.1 of Exhibit 1 within three (3) business days after such document is provided to EPA.  Plaintiffs may provide comments to Defendants and EPA within 30 days.

20.    At least 60 days prior to beginning work on any liner installation, Defendants shall provide to Plaintiffs an installation plan and QAPP for review and comment. Plaintiffs may provide comments to Defendants and EPA within 30 days.

21.    To the extent EPA representatives are not present during liner installation, Plaintiffs may have two representatives present as observers at the Dairy Facility during each distinct phase of liner installation: draw down and pump out; re-grading; addition and compaction of fill material; installation of liner materials.  Such representatives shall have applicable scientific or professional qualifications to make their review meaningful and to confirm compliance with the Consent Decree and the Lagoon Plan. At least 48 hours prior to any such observation, Plaintiffs shall provide written notice of such intent to observe directly to Defendants and their counsel.  Such notice shall

include the names of the proposed observers, a description of the observers'

qualifications (to the extent not already known), as well as the start and end time of the

proposed period of observation.  The representatives may not remain on site outside of

work hours and must be accompanied by a representative of Defendants at all times

(including being accompanied on and off the property).

## GROUNDWATER MONITORING

22.    Defendants and Plaintiffs disagree about whether it is reasonable or necessary to

install additional monitoring wells south or southwest of the Dairy Facility, and in

particular south of the Sunnyside Irrigation Canal.  Plaintiffs contend that such

monitoring wells are necessary to determine whether, how long and in what magnitude

Defendants' operations continue to contribute to groundwater contamination.

Defendants contend that the combined provisions of the Consent Decree and the AOC

eliminate any possibility of continuing or future contamination and are concerned that

such downgradient monitoring wells may be impacted by significant contaminants from

other sources.  For the purposes of compromise, Defendants agree to join with Cow

Palace Dairy, LLC, George DeRuyter & Son Dairy, LLC, and D&A Dairy, LLC, to

fund the installation of a grid of 14 new monitoring wells.  All such monitoring wells

shall be installed as soon as practicable.  The locations of the other new wells are

generally depicted in the map attached hereto as Exhibit 2 and are subject to location

refinement as site conditions or property rights require.  The Parties hereto, in

collaboration with the other dairies, shall consult and agree on the precise new well locations. Plaintiffs shall have access to the actual monitoring well installation to ensure that all wells are installed as agreed. Defendants shall sample the new monitoring wells under the same terms and at the same time as sampling occurs under the AOC for the other monitoring wells installed on Defendants' property, and at least once per quarter during the term of this Consent Decree regardless of whether the AOC continues. At least 60 days prior to beginning work on monitoring well installation, Defendants shall provide to Plaintiffs an installation plan and QAPP for review and comment. Plaintiffs shall provide comments within 30 days and the Parties must agree on the QAPP in writing at least 10 days before construction of the wells is allowed to commence.

23.    All aspects of Defendants' obligations with respect to groundwater monitoring, as set forth above in Paragraphs 22, are subject to review, approval, and modification by EPA under the AOC.

24.    Defendants agree to provide to Plaintiffs in electronic form the laboratory results of each groundwater sampling event at the same time the results are provided to EPA.

<u>**CENTRIFUGE MANURE SEPARATOR**</u>

25.    As part of their commitment to reducing the nutrients applied to their farming operations, Defendants have installed and shall maintain a centrifuge manure separator

at the Dairy.  The Parties anticipate that operation of a centrifuge separator will reduce the nitrogen and phosphorus content of the Dairy's liquid manure.

26.    The centrifuge separator shall operate "in-line" with the Dairy's existing manure separator system.  "In-line" means that manure shall first be processed by the Dairy's pre-existing manure separator, then processed in the centrifuge separator, removing additional solids from the liquid manure.  This procedure shall remain in place except for brief periods in which the centrifuge may be undergoing repair or maintenance.

27.    Defendants shall provide Plaintiffs with data concerning nutrient removal and information about how the nutrients are to be used.  Such information shall be provided to Plaintiffs within 90 days of entry of this Consent Decree and as part of the annual information required to be provided to Plaintiffs.

## UNDERGROUND CONVEYANCE INSPECTION

28.    Defendants agree to inspect all underground conveyance systems (piping, joints, manholes, inlet structures and discharge structures).  Inspection shall consist of pressure testing of all transmission lines and/or video inspection and documentation of all underground structures.  Results of all such inspections shall be provided to Plaintiffs' designated representative(s) within five (5) business days of completion.  Leaks or improper piping shall be fixed so that all wastes are appropriately directed to lined lagoons.

## COW PENS

29.     No later than December 31, 2016, Defendants shall install concrete aprons along all water troughs within all the cow pens at the Dairy Facility, with appropriate piping or diversion that redirects all collected wastewater to the Dairy Facility's lagoon system. Aprons shall be constructed to generally applicable industry standards, with no less than ten (10) feet of concrete between the outside edge of the trough to the edge of the apron.

30.     Effective upon entry of this Consent Decree, Defendants shall implement a protocol of regularly inspecting for and re-grading all low-lying or wet spots within all the cow pens at the Dairy Facility.  Upon identification of any ponding of water Defendants shall promptly take reasonable steps to alleviate such ponding, including, as may be appropriate, vacuuming and removing any ponded water from the pens.  The re-grading process shall slope any low-lying or wet spots such that they no longer collect, or have the potential to collect, runoff from the cow pens.  Such inspection and re-grade shall occur at least monthly as weather conditions allow, and as practical in months where weather conditions make re-grading problematic.

31.     Manure shall be scraped in the cow pens at least weekly and any accumulated piles removed at least monthly from March through October.  Defendants will grade each cow pen before November 31 of each year so that any runoff from piled manure is routed to the alleys or other such drains in order that such runoff be conveyed directly to the lagoon system or digester.

## SILAGE AREA

32.    Effective upon entry of this Consent Decree, Defendants shall ensure that their Silage Areas are located entirely on an impervious surface.  For purposes of this section, the storage of natural products (hay, triticale, for example, but not corn) that are expected to be incorporated into silage are not considered located in the Silage Area, but rather are stored in synthetic AgBags in an area adjacent to the Silage Area.  So long as the natural products are stored in synthetic AgBags, or containers of similar construction that prevent regular contact with soils, such natural products need not be maintained on an impervious surface.  AgBags shall be positioned so that if there is any leachate it will be directed to an asphalt apron where it shall be collected and conveyed to the lagoons.

## COMPOST AREA

33.    Defendants shall limit the composting area at the Dairy Facility to 30 acres starting December 31, 2019.

34.    At the existing compost areas at the Dairy Facility, Defendants shall (1) re-grade the area to a slope between 3% and 4% and (2) compact the area to 95% of standard proctor compaction to reduce permeability ensure a permeability value of no less than 1 x $10^{-4}$ cm/sec.  These actions shall be taken as to one-third of the area in each of the ensuing three years, starting with the year beginning 2016.  The Parties recognize that the permeability value of 1x10-4 is a negotiated value, and Plaintiffs' acceptance of this value for the purposes of settlement may not be construed as an admission that such

value will prevent leaching.  The Parties also recognize that compaction to 95% of standard proctor may well result in a permeability value significantly in excess of 1x10-4.

35.     By December 31, 2018, Defendants shall line all swales and low spots with asphalt or similar surface to direct leachate to the lagoon system.

36.     Beginning on January 1, 2017, all composted manure will be fully cycled annually such that no compost will remain at the Dairy Facility for longer than one calendar year.

## MANURE APPLICATION & FIELD MANAGEMENT

37.     Defendants shall ensure that all future applications of liquid and solid manure to agricultural fields owned, leased, or otherwise controlled by the Defendants are based upon the nutrient management budget contained in Exhibit 3.  The nutrient budget requires Defendants to determine all future manure application rates based on residual soil nitrate and phosphorus levels, ensuring that manure is applied in agronomic quantities and rates as defined herein.  Furthermore, the post-harvest sampling contemplated under this Consent Decree shall be conducted consistent with the post-harvest sampling requirements of the AOC.

38.     In addition to the requirement to always apply at agronomic rates and consistent with the nutrient budget, Defendants shall comply with the following restrictions for 50% of their fields:

a. Consistent with the requirements of the AOC, Defendants shall take soil tests in all manure application fields following the 2015 harvest. To the extent any field that is owned, leased, or otherwise controlled by the Defendants has been shown, post-harvest, to have an average of greater than 40 ppm residual nitrate plus ammonium in the top two feet of the soil column, Defendants shall not apply to such field in 2016 until and unless the average is shown by subsequent test to be below 40 ppm. Thereafter Defendants may apply to agronomic rates and in accordance with the nutrient budget. In addition, for fields with more than 40 ppm phosphorus in the upper foot, based on a valid sample obtained during the 2015 calendar year, manure may only be applied in a manner that, based upon a nutrient budget, seeks to reduce phosphorus application to less than 66.66 percent of crop removal. In addition, fields that exceed any of the numbers listed above shall be considered for planting in alfalfa during 2016.

b. To the extent any field that is owned, leased, or otherwise controlled by the Defendants which was shown, post-harvest 2016, to have an average of greater than 35 ppm residual nitrate plus ammonium in the top two feet of the soil column, Defendants shall not apply to such field in 2017 until and unless the average is shown by subsequent test to be below 35 ppm. Thereafter Defendants may apply to agronomic rates and in accordance

with the nutrient budget.  In addition, for fields with more than 40 ppm phosphorus in the upper foot, based on a valid sample obtained during the 2017 calendar year, manure may only be applied in a manner that, based upon a nutrient budget, seeks to reduce phosphorus application to less than 66.66 percent of crop removal.

c. To the extent any field is owned, leased, or otherwise controlled by the Defendants which has been shown, post-harvest 2017, to have an average of greater than 30 ppm residual nitrate plus ammonium in the top two feet of the soil column, Defendants shall not apply to such field in 2018 until and unless the average is shown by subsequent test to be below 30 ppm. Thereafter Defendants may apply to agronomic rates and in accordance with the nutrient budget.  In addition, for fields with more than 40 ppm phosphorus in the upper foot, based on a valid sample obtained during the 2018 calendar year, manure may only be applied in a manner that, based upon a nutrient budget, seeks to reduce phosphorus application to less than 66.66 percent of crop removal.

d. To the extent any field owned, leased, or otherwise controlled by the Defendants has been shown, post-harvest 2018, to have an average of greater than 25 ppm residual nitrate plus ammonium in the top two feet of the soil column, Defendants shall not apply to such field in 2019 and

thereafter until and unless the average is shown by subsequent test to be below 25 ppm. Thereafter Defendants may apply to agronomic rates and in accordance with the nutrient budget. In addition, for fields with more than 40 ppm phosphorus in the upper foot, based on a valid sample obtained during the calendar year at issue, manure may only be applied in a manner that, based upon a nutrient budget, seeks to reduce phosphorus application to less than 66.66 percent of crop removal until such time as phosphorus levels are reduced to 40 ppm or less phosphorus in the upper foot of the soil column, based on a valid sample obtained during the calendar year of planting. Once 40 ppm is achieved, no applications of manure will be allowed that cause residual phosphorus levels to once again exceed 40 ppm.

39.    With respect to the remaining 50% of Defendants' fields, Defendants shall at all times observe the phosphorus limitations set forth in Paragraph 38. Post-harvest nitrate limitations and the impact on the following year's applications shall operate in the same manner as set forth in Paragraph 38, although the limitations themselves are modified as follows:

       a.  Post-harvest 2015, 45 ppm;

       b.  Post-harvest 2016, 45 ppm;

       c.  Post-harvest 2017, 40 ppm;

      d.  Post-harvest 2018, 40 ppm;

      e.  Post-harvest 2019 35 ppm;

      f.  Post-harvest 2020, 30 ppm;

      g.  Post-harvest 2021 and thereafter, 25 ppm.

40.    Defendants shall provide a list to Plaintiffs no later than December 31, 2015, identifying which fields are subject to the requirements of Para. 38 and which fields are subject to the requirements of Para. 39.  In addition to the above limitations, if it appears that additional nutrients are required during the spring/summer growing season to any crop, Defendants shall first take tissue samples to determine whether additional nutrients may be applied agronomically.

41.    Furthermore, in the event any given field fails to meet the post-harvest nitrate limit for any field in two consecutive years, then the nutrient budget shall be modified in a manner designed to consistently reach the post-harvest limit.  Plaintiffs shall be consulted on any such modifications.  If the Parties cannot agree to an acceptable modification prior to March 31st of the year following the second non-compliant test, then the matter shall be submitted to mediation and/or binding arbitration, at Defendants' expense.

42.    It is Plaintiffs' position that the limits for application set forth herein are a compromise intended to achieve significant reduction of ongoing impacts but may not represent the scientific standards that may be needed to provide full, long-term

environmental protection.  Plaintiffs have agreed to limitations set forth herein, in conjunction with the Clean Drinking Water Project, in order to provide immediate relief to potentially impacted residents while the regulatory agencies address the longer-term standards necessary to protect human health and the environment.

43.    Beginning immediately, Defendants shall ensure that all liquid manure applications to its fields are measured by flow meters, and that all application fields are equipped with at least two moisture sensor stations.  The application and irrigation monitoring will be conducted in accordance with EPA-approved "Irrigation Water Monitoring Quality Assurance Plan", dated November 20, 2013.  Each sensor station shall include a data logger with sensors at 1', 2', and 3' of depth, as well as a rain gauge.  The data shall be transmitted via cell modem to a web-based software application that presents the data in tabular and graphical form.  The water measurements shall be considered against projected evapotranspiration and anticipated crop needs, and irrigation recommendations will be made accordingly for each field, each week, for the entire irrigation season.  The sensor system shall be outfitted with an alarm function that will immediately notify Defendants' representatives if the moisture level in the third foot sensor reaches field capacity.  If the third foot in any field reaches field capacity then irrigation shall be promptly discontinued.

44.    Defendants shall make available to Plaintiffs copies of all manure management documents created by the Dairy Facility, including but not limited to, field application

summaries, third-party manure application summaries, regularly maintained moisture sensor data, soil sampling, manure sampling, handwritten field application logbooks, crop yield data, tissue sampling data, nutrient budgets, and nutrient planning and application documents generated by Defendants.

## PROVISION OF BOTTLED WATER OR REVERSE OSMOSIS SYSTEM

45.    Defendants agree to fund the provision of clean drinking water to eligible residences identified within the geographical area depicted on Exhibit 4 ("Covered Area").  Eligible residences are those that have a valid test result from their drinking water source in the prior 5 years showing a nitrate level of 10 ppm or higher and no reverse osmosis system, and residences that do have a reverse osmosis system but that have a similarly valid test result showing nitrate level of 60 ppm or higher.  This program is hereafter referred to as the "Clean Drinking Water Project."

46.    The Parties hereby agree to have the Clean Drinking Water Project be administered by a third party, in consultation with CARE.  Until the Clean Drinking Water Project is in place, the existing alternative water provision program set forth in ECF Nos. 336 (Cow Palace), 179 (Bosma) and 119 (DeRuyter) shall remain in place. For purposes of funding such Project, Defendants shall contribute $3,000 per month for the first three months the Project is in place, and $2,000 per month thereafter until the Consent Decree is terminated with respect to nitrates in drinking water.  To the extent the contributions of Defendants and other parties do not cover all of the reasonable costs

of the Project, Defendants agree to contribute additional monies as reasonably requested and supported by the third party administrator up to a limit of an additional $25,000 over the course of the Consent Decree.

47.     The Parties agree that the purpose of the Project is to ensure that all eligible residences within the Covered Area are provided access to either bottled water or reverse osmosis systems.  Bottled water must be obtained from a reliable commercial source, and the water must meet all applicable drinking water standards.  Reverse osmosis systems may be installed instead of bottled water but bottled water must be provided until such systems are in place and functioning.  All costs of installation, maintenance and repair of alternative water systems shall be covered, to the extent funds are available, by the Project.

48.     Bottled water service and/or reverse osmosis systems shall be offered to any eligible residence within the Covered Area.  The Parties shall jointly propose that GWAC help facilitate the Project, and that a mutually agreed third party administer the Project.  The specific protocols of the Project shall be determined by the third party in consultation with CARE, and CARE shall have authority to oversee and monitor the Project.

49.     If CARE and the third party agree that the funds from Defendants or any other sources have fulfilled the purpose of the Project, then CARE and the third party may utilize any excess funds to supply clean drinking water to such persons or residences in

the Granger/Outlook/Sunnyside area that they believe, in their joint discretion, to be most impacted by contaminated groundwater. In no event may any excess funds be refunded to Defendants.

50.    Defendants' obligation to contribute to the Clean Drinking Water Project shall terminate only as provided below in Paragraph 53(C).

**PAYMENT OF ATTORNEYS' FEES, EXPERT WITNESS FEES, AND COSTS**

51.    Within 60 days of entry of this Consent Decree by the Court, Defendants shall pay an initial amount of Plaintiffs' attorneys' fees, expert witness fees, and costs incurred in association with this lawsuit, in the amount of $300,000, to the Law Offices of Charles M. Tebbutt, P.C. Within 60 days of such payment, Plaintiffs may petition the Court for an award of further reasonable attorneys' and expert fees and costs.

52.    Defendants also agree to contribute a reasonable and limited sum for fees and costs that may be incurred in monitoring compliance with this Consent Decree in an amount not to exceed $9,000 per year for 2015-2017 and $4,000 per year thereafter until termination. Plaintiffs shall submit to Defendants' counsel, no later than January 30 of each year, an invoice for Plaintiffs' fees and costs related to the Consent Decree for the prior year. Payment shall be made within 30 days of the date of the invoice. If there is a dispute about the fees, then such dispute shall be resolved through the dispute resolution provisions set forth in Paragraph 55.

**TERMINATION**

53.    This Consent Decree shall terminate as follows:

A.    With the exception of the Clean Drinking Water Project and phosphorus, this Consent Decree shall terminate seven years after entry if Defendants have complied with all material terms.  Compliance with material terms means that Defendants will have, at a minimum:

a.    Provided reasonable and timely access to EPA and Plaintiffs' representatives as contemplated in the Consent Decree;

b.    Substantially and in good-faith complied with all record-keeping, notice and document production obligations;

c.    Substantially and in good-faith complied with all obligations under the AOC, including in particular the Immediate Source Control Actions;

d.    Timely installed lagoons in a manner consistent with an approved lagoon plan, and maintained and repaired the lagoons in a manner consistent with industry standards;

e.    Installed, maintained, monitored and reported information from the new monitoring wells in a manner consistent with their obligations herein;

f.    Managed the centrifuge, compost, pens, underground conveyances, silage, and other dairy operations in a manner consistent with best dairy practices, the nutrient management plan, and their obligations herein;

g.    Substantially complied with their obligations under the Application Field Management Plans and Irrigation Water Management Plans, and **strictly** complied with their duty to **only** apply at agronomic rates, within the nutrient budget, and exclusively as allowed under this Consent Decree;

h.    Consistently achieved post-harvest limits of 25 ppm nitrate average, including ammonium, in the top two feet, in at least half of their fields, with demonstrable downward trends in all other fields, according to the time frames set forth in this Consent Decree; and provided that all obligations as they relate to nitrates shall continue to be honored and observed under the Dairy's nutrient management plan.

B.    The seven year termination date set forth in Paragraph 53A may be modified to five years if Defendants voluntarily agree, in writing, and before September 1, 2019, to observe the post-harvest nitrate limitations set forth in Paragraph 38 with respect to ALL fields, and if Defendants have completed lining all lagoons no later than December 31, 2019.  Similarly, the seven year termination date set forth in Paragraph 53A may be modified to six years if Defendants voluntarily agree, in writing, and before September 1, 2020, to observe the post-harvest nitrate limitations set forth in Paragraph 38 with respect to ALL fields, and if all lagoons have been lined by such date.

C.    This Consent Decree shall terminate with respect to obligations relating to phosphorus only when at least 50% of Defendants' fields have tested post-harvest at or less than 40 ppm average in the top two feet of the fields, and with demonstrable

downward trends in all other fields.  Notwithstanding the termination of this Consent Decree, the provisions herein as they relate to phosphorus shall continue to be honored and observed under the Dairy Facility's nutrient management plan.

D.    With respect to the Clean Drinking Water Project, and for those provisions that have not otherwise terminated with respect to the other obligations set forth in Paragraph 53A, above, this Consent Decree shall terminate only when the 13 wells shown on the map attached hereto as Exhibit 2 (including YVD wells 8, 9, 10, 15, DC-03, DC-03D, and new wells 2-8) test at 10 ppm nitrate for 8 consecutive quarters; or when the collection of data from all wells shows a consistent downward trend, such that a reasonable person would conclude that the Dairy Facility is no longer a significant source of nitrates to groundwater.  To the extent the Parties do not agree, the matter shall be submitted to the dispute resolution process, and if need be to the Court for hearing and resolution.

## INTEGRATION

54.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement reflected in this Consent Decree, and supersedes all prior agreements and understandings among the Parties related to the subject matter in this Consent Decree.

[PROPOSED] CONSENT DECREE- 28

**DISPUTE RESOLUTION**

55.     In the event of any dispute regarding implementation, interpretation, or compliance with this Consent Decree, the Parties shall first attempt to informally resolve that dispute through meetings of the Parties.  Any Party may initiate the informal dispute resolution process by serving written notice of a request for dispute resolution on the other Party.  If no resolution is reached within thirty (30) calendar days of the date that the notice of a request for dispute resolution is served, then the Parties may resolve the dispute by filing motions with the Court.

**EFFECTIVE DATE**

56.     The effective date of this Consent Decree shall be the date upon which the Court enters in the civil docket a copy of this Consent Decree signed by the Court.

**FINAL JUDGMENT**

57.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final, non-appealable judgment of the Court under Rules 54 and 58 of the Federal Rules of Civil Procedure.

**NOTICES**

58.     Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Consent Decree, it shall be directed to the individuals at the addresses specified below, unless prior notice of a change has been given to the other Party.  A notice is sufficient under this Consent Decree if it is

[~~PROPOSED~~] CONSENT DECREE- 29

provided in writing through U.S. mail, hand-delivered, or provided electronically by e-mail, with e-mail being the first choice for all communications. If notice is provided via U.S. mail, it shall be considered effective upon the date of mailing.

For Plaintiffs CARE and CFS:

Charles M. Tebbutt, Law Offices of Charles M. Tebbutt (e-mail to be provided), attention: Yakima Valley Dairies Consent Decree

For Defendants:

Brendan Monahan, Stokes Lawrence Velikanje Moore & Shore (e-mail to be provided), attention: Yakima Valley Dairies Consent Decree

The Parties shall exchange designated e-mail addresses to be used in accordance with this Section no later than three (3) business days after entry of this Consent Decree. Any Party may change either the notice recipient or the address for providing notices to it by serving the other Parties with a notice setting forth such new notice recipient or address.

WE HEREBY CONSENT to the Entry of this Consent Decree.

COMMUNITY ASSOCIATION FOR
RESTORATION OF THE ENVIRONMENT, INC.

By: _____
Helen Reddout, President

CENTER FOR FOOD SAFETY, INC.,

By: _____
George Kimbrell, Senior Attorney

*Plaintiffs*

[PROPOSED] CONSENT DECREE- 30

HENRY BOSMA DAIRY,
  aka Bosma Dairy Partners LP -
    By: Bosma Enterprises, Inc., General Partner

By: _____
        Henry Bosma, President


LIBERTY DAIRY, LLC
  By: Bosma Dairy Partners LP, Member
  By: Bosma Enterprises, Inc., General Partner

By: _____
        Henry Bosma, President


ARIZONA ACRES LIMITED PARTNERSHIP
  By: Bosma Enterprises, Inc., General Partner

By: _____
        Henry Bosma, President


LIBERTY ACRES, LLC
  By: Bosma Enterprises, Inc., Manager

By: _____
        Henry Bosma, President


_____
HENRY BOSMA, an individual

IT IS SO ORDERED THIS __19th__ Day of May, 2015.

_____
THOMAS O. RICE
United States District Judge


[~~PROPOSED~~] CONSENT DECREE- 31

Respectfully submitted this 11th Day of May, 2015 and effective on the date entered by the Court.

s/ Brad J. Moore
BRAD J. MOORE, WSBA #21802
Stritmatter Kessler Whelan
200 Second Ave. W.
Seattle, WA  98119
Tel. 206.448.1777
E-mail: Brad@stritmatter.com

*Local counsel for Plaintiffs*

s/ Charles M. Tebbutt
CHARLES M. TEBBUTT
WSBA #47255
DANIEL C. SNYDER
OR Bar No. 105127 (*pro hac vice*)
Law Offices of Charles M. Tebbutt, P.C.
941 Lawrence St.
Eugene, OR 97401
Tel. 541.344.3505
E-mail: charlie.tebbuttlaw@gmail.com
dan.tebbuttlaw@gmail.com

*Counsel for Plaintiffs*

s/ Jessica L. Culpepper
JESSICA L. CULPEPPER
NY Bar Member (*pro hac vice*)
Public Justice
1825 K Street NW, Ste. 200
Washington, DC 20006
Tel. 202.797.8600
E-mail: jculpepper@publicjustice.net

*Counsel for Plaintiffs*

s/ Elisabeth A. Holmes
ELISABETH A. HOLMES
OR Bar No. 120254 (*pro hac vice*)
GEORGE A. KIMBRELL
WA Bar No. 36050
Center for Food Safety, 2nd Floor
303 Sacramento Street
San Francisco, CA 94111
Tel. 415.826.2770

Emails:
eholmes@centerforfoodsafety.org
gkimbrell@centerforfoodsafety.org

*Counsel for Plaintiff Center for Food Safety*

s/ Toby James Marshall
TOBY J. MARSHALL, WSBA # 32726
BETH E. TERRELL, WSBA # 26759
Terrell Marshall Daudt & Willie PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
206-816-6603
Emails: bterrell@tmdwlaw.com
tmarshall@tmdwlaw.com

[PROPOSED] CONSENT DECREE- 32

1  *Counsel for Plaintiffs*

2

3  s/Debora K. Kristensen                                  s/Brendan V. Monahan
   Debora K. Kristensen                                    Brendan V. Monahan
4  Jeffrey C. Fereday                                      Sean A. Russel
   Preston N. Carter                                       Stokes Lawrence
5  Givens Pursley LLP                                      120 N. Naches Avenue
   601 W. Bannock St.                                      Yakima, WA  98901
6  Boise, ID  83702                                        bvm@stokeslaw.com
   dkk@givenspursley.com                                   sean.russel@stokeslaw.com
7  jefffereday@givenspursley.com                           Mathew L. Harrington
   prestoncarter@givenspursley.com                         Olivia Gonzalez
                                                           Stokes Lawrence
8  *Counsel for Defendants Henry Bosma*                    1420 Fifth Avenue
   *Dairy and Liberty Dairy LLC*                           Seattle, WA  98101
9                                                          MLH@stokeslaw.com
                                                           olivia.gonzalez@stokeslaw.com
10

11 s/C. Tom Arkoosh                                        *Counsel for Defendants Henry Bosma*
   C. Tom Arkoosh                                          *Dairy and Liberty Dairy LLC*
12 Arkoosh Law Offices
   802 W. Bannock St., Ste. 900
13 P.O. Box 2900
   Boise, ID  83701
14 tom.arkoosh@arkoosh.com

15 *Counsel for Defendants Liberty Acres,*
   *LLC, Arizona Acres, Limited*
16 *Partnership, and Henry Bosma, Sr.*

17

18

19

20

21

22

23

24

[PROPOSED] CONSENT DECREE- 33